UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————— X

JILL A. KUPFERBERG and NANCY             :     Case No.  1:23-cv-1220
GOODMAN, individually and on behalf      :
of all others similarly situated,        :     CLASS ACTION COMPLAINT
                                         :
         Plaintiffs,                     :
                                         :
    v.                                   :     <u>DEMAND FOR JURY TRIAL</u>
                                         :
AMERICAN AIRLINES GROUP INC.             :
and JETBLUE AIRWAYS                       :
CORPORATION,                             :
                                         :
         Defendants.                     :
                                         :
——————————————————————— X

Plaintiffs Jill A. Kupferberg and Nancy Goodman (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following against Defendants American Airlines Group Inc. ("American") and JetBlue Airways Corporation ("JetBlue") (collectively, "Defendants") for damages, injunctive relief and other relief pursuant to the federal antitrust laws. The allegations are based upon personal knowledge and upon information and belief as to all other matters based upon publicly available information and the investigation conducted by and through their counsel.

## NATURE OF THE ACTION

1.      This is an action under the federal antitrust laws to: restrain the anticompetitive conduct of American and JetBlue, to remedy the effects of Defendants' unlawful conduct, and to remedy harm to consumers who purchased airline tickets from Defendants.

2.      Under an umbrella agreement, the Northeast Alliance Agreement (the "Alliance") the two once- rival airlines have agreed to share their revenues and to coordinate which routes to fly, when to fly them, who will fly them, and what size planes to use on flights to and from four major airports: Boston Logan International Airport ("Boston Logan"), LaGuardia Airport ("LaGuardia"), John F. Kennedy International Airport ("JFK"), and Newark Liberty International Airport ("Newark Liberty").

3.      By coordinating their businesses in this way, American and JetBlue will effectively merge their operations on flights to and from the four airports—which collectively account for two thirds of JetBlue's business. In so doing, the Alliance results in Plaintiffs and the members of the Class (defined below) paying supra-competitive prices for airline tickets.

4.      American and JetBlue have reaped rich rewards since the companies began implementing the Alliance in early 2021. American is free to raise prices in the Northeast without fear of competition from its now-collaborator, JetBlue. JetBlue is free to raise prices without fear of

competition from one of the most powerful market participants, American. Under the Alliance, the companies restrict the available ticket offerings and charge more than if they had to compete with one another.

5.    This sort of horizontal market allocation, where two competitors agree not to compete for customers in order to preserve or enhance their own profits, is precisely the sort of anticompetitive arrangement that is condemned as *per se* illegal. The United States Department of Justice ("DOJ"), the United States Department of Transportation ("DOT"), and several states' attorneys general all claim that Defendants' conduct was illegal.

6.    Yet, the Alliance continues to be expanded.  Indeed, JetBlue's Chief Executive Officer ("CEO") Robin Hayes stated on January 27, 2023, that JetBlue was looking forward to continuing the "momentum" that the Alliance created, momentum which netted JetBlue over $100 million in 2021 alone while consumers paid higher prices on average at those airports where the Alliance has taken effect.

7.    Plaintiffs and the members of the Class bring this Action for damages, treble damages, and reasonable attorneys' fees against Defendants under the federal antitrust laws. Additionally, Plaintiffs seek injunctive relief on behalf of themselves and the members of the Class, including, but not limited to, the disbanding of the Alliance.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this Action arises out of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and §§ 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26), because Plaintiffs allege violations of federal law.

9.    This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of

the illegal scheme throughout the United States, including in this District. The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

10.     Venue is proper in this District pursuant to § 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain their principal place of business, have business facilities, have agents, transact business, and are otherwise found within this District, and certain unlawful acts alleged herein were performed and had effects within this District.

## PARTIES

11.     Plaintiff Jill A. Kupferberg ("Kupferberg"), a natural person and a resident of the state of New York, is a direct purchaser of flights from American, and has purchased its services at least once during the proposed Class Period, on flights originating out of and/or returning to New York area airports. Plaintiff Kupferberg has paid American directly either through American's mobile application or through American's website for her tickets purchased in order to travel on these flights.

12.     Plaintiff Nancy Goodman ("Goodman"), a natural person and a resident of the state of New Jersey, is a direct purchaser of flights from JetBlue, and has purchased its services at least once during the proposed Class Period, on flights originating out of and/or returning to New York area airports.  Plaintiff Goodman has paid JetBlue directly either through JetBlue's mobile application or through the JetBlue website, for her tickets purchased in order to travel on these flights.

13.     Defendant JetBlue is a low-cost airline founded in 1998. In 2019, JetBlue flew over 42 million passengers to approximately 100 locations worldwide, taking in roughly $8 billion in revenues. JetBlue has had a significantly lower cost structure than the so-called legacy airlines—

American, Delta Air Lines, and United Airlines—allowing it to operate profitably even when offering consumers lower fares. JetBlue also offers two classes of service, which helps it compete effectively against the legacy carriers for higher-paying leisure and business customers. JetBlue is a Delaware corporation with its headquarters in Long Island City, New York.

14.     Defendant American is the largest airline in the world. In 2019, the last full year before the pandemic, American flew approximately 215 million passengers to more than 365 locations worldwide, taking in roughly $45 billion in revenues. American is a Delaware corporation with its headquarters in Fort Worth, Texas.

## FACTUAL ALLEGATIONS

### A.     The Alliance Agreements

15.     On July 15, 2020, American and JetBlue entered into the Alliance. The Alliance is made up of distinct agreements between Defendants.

16.     The Alliance commits Defendants to pool revenues and coordinate "on all aspects" of network planning at Boston Logan, JFK, LaGuardia, and Newark Liberty, including deciding together which routes to fly, when to fly them, who will fly them, and what size planes to use. The Alliance was amended in September 2020 to prevent either company from selling or transferring slots at the four airports to any other airline, ensuring that capacity remained constrained.

17.     One of the goals of the Alliance is to make "each carrier indifferent" about whether a passenger chooses American or JetBlue for a particular flight to or from the four airports.

18.     The Mutual Growth Incentive Agreement commits Defendants to pool and apportion revenues earned on flights to and from the four airports such that each partner earns the same revenues regardless of whether a passenger flies on American or JetBlue.

19.     A codeshare agreement is an arrangement by which one carrier (the marketing carrier) places its airline code on a flight operated by another carrier (the operating carrier). The

4

Codeshare Agreement between American and JetBlue enables American and JetBlue to sell each other's flights as their own.

20.     There are two reciprocal agreements governing the companies' frequent flyer programs called the "AAdvantage Participating Carrier Agreement" and the "TrueBlue Participating Carrier Agreement." These agreements allow American's AAdvantage members to earn miles while flying on a JetBlue flight governed by the Alliance; and allow JetBlue's TrueBlue customers to earn miles on an American flight within the Alliance. By effectively erasing the distinction between the two airlines' frequent flyer programs, American and JetBlue eliminated a potent source of competition between airlines for repeat customers.

21.     Following the announcement of the Alliance in July 2020, American and JetBlue continued to form agreements to lock in their agreement not to compete.

22.     These kinds of restraints of trade—agreements between competitors to coordinate on output or to share revenues—are often condemned as *per se* illegal because they have the same tendencies to increase prices and reduce output as explicit horizontal agreements on price. While American and JetBlue technically retain the ability to price independently under the Alliance, in reality, neither airline has the incentive to undercut the other on price because doing so would reduce the revenues each earns under the revenue-sharing arrangement. Moreover, Defendants can raise fares simply by one of them exiting a market where it competed against the other, and then share in their now-ally's increased profits. They can also agree to cut the number of seats they fly in a market and, in so doing, raise fares. In any of these ways, American and JetBlue can increase fares without ever talking to each other about pricing.

23.     Through the Alliance, American and JetBlue has effectively merged their operations in Boston and New York City and reduced choices for consumers. The Alliance is

5

anticompetitive and unlawful as a whole, and the output coordination and revenue-sharing restraints present particular competitive concerns due to their inherently anticompetitive nature.

**B.    Industry Background**

**1.  Domestic Consolidation in Airline Industry**

24.    The U.S. airline industry has experienced considerable consolidation through mergers and acquisitions over the last two decades. Today, it is dominated by four large airlines: the three legacy airlines—American, Delta Air Lines, and United Airlines—and Southwest Airlines. American is the largest of these airlines. Together, the four control over 80 percent of domestic air travel.

25.    American's management has long been a "proponent of consolidation in the industry." As American's current CEO, Doug Parker, explained in 2012: "With fewer airlines, there are fewer of us trying to get the same number of customers." "Domestic consolidation" remains one of American's "long term projects."

26.    Doug Parker served as CEO of America West when it merged with US Airways. Later, he served as CEO of US Airways when it merged with American. Internally, American has referred to Mr. Parker as the "Godfather of consolidation."

27.    Consolidation may have benefited American, but as JetBlue's CEO told the public less than two years before entering into the Alliance, "it has come at a cost to consumers. Just look at the fares in some of the fortress hubs and in some of the legacy-dominated markets without low-fare competition. Chances are, you'll see fares that are higher than they should be and in that construct there's very little incentive to provide great service or to innovate."

28.    One way that consolidation has produced this result is by allowing the major airlines to reduce "capacity," the industry's term for the number of seats made available to consumers. As

American's CEO explained to investors in 2006, there is an "inextricable link" between removing seats and raising fares.

29.     In addition to facilitating capacity reductions, consolidation has made it easier for American and other legacy carriers to restrict domestic capacity growth. The legacy airlines euphemistically call this effort "capacity discipline." To promote it, senior executives of the legacy airlines have used public statements to emphasize the importance of restricting industry growth and to communicate their individual commitments to keep growth in check.

30.     JetBlue's CEO put it succinctly in 2019: "there's been a lot of consolidation in the U.S., and we really don't have a competitive industry."

### 2.  International Consolidation in the Airline Industry

31.     In parallel with their efforts to achieve domestic consolidation, American and the other legacy airlines have sought to consolidate the industry internationally. They have done so through joint ventures similar to the one American now attempts to impose on consumers in the United States. In transatlantic markets, for example, American has entered into a joint venture with British Airways, Iberia, Finnair, and Aer Lingus, by which they share revenues and coordinate operations and pricing. Delta has formed a similar alliance with Air France, KLM, and Virgin Atlantic. United has done the same with Lufthansa and Air Canada.

32.     As JetBlue's CEO explained in October 2019, the result is that:

[B]etween the U.S. and Europe, you'd think there's about 12-15 airlines flying, but there really isn't. You know, there are three large joint ventures. In these joint ventures, these airlines have a permission slip to collude, set pricing, set scheduling together. Look, if it happened in any other industry, they'd march you off to the penitentiary, but in aviation it's taken hold . . . And that's why you get such high fares.

33.     American uses that strategy of an alliance to co-opt a disruptive competitor: JetBlue.

### 3.  JetBlue's Role as a Disrupter

34.    For years, JetBlue has undermined American's efforts to restrain industry capacity growth and raise fares. The contrast between JetBlue and American's strategies has been stark. As JetBlue's CEO explained in 2015, the "legacy airlines will boast about capacity discipline" and "boost profits with higher fares," but JetBlue will do the opposite: "We'll add capacity to keep fares competitive."

35.    The numbers back it up. Between 2004 and 2019, the last full year before the pandemic, JetBlue expanded its domestic capacity by more than 149 percent, as measured by available seat miles ("ASMs"), a common industry measure of capacity. By contrast, over that same time period, American's domestic capacity actually declined. Indeed, accounting for the consolidation achieved through mergers, the three legacy carriers collectively reduced domestic capacity by 4 percent over this period.

36.    JetBlue's capacity growth has been especially remarkable in markets to or from endpoints in the Northeast, where JetBlue has focused its operations.  By 2019, JetBlue had grown into the fourth largest carrier in those markets, with roughly 16 percent of capacity, after American (21 percent), Delta (21 percent), and United (20 percent). To achieve that status, JetBlue grew its capacity within those markets 154 percent between 2004 to 2019, adding approximately 25 billion ASMs. By contrast, American and the other legacies collectively shrunk their capacity by 9 percent, or approximately 15 billion ASMs.

37.    JetBlue's capacity growth also has been remarkable in markets within the East Coast. By 2019, JetBlue had grown into the third largest carrier in those markets, with roughly 16 percent of capacity, after Delta (26 percent) and American (23 percent). To achieve that status, JetBlue grew its capacity 182 percent in those markets between 2004 and 2019, adding approximately 12 billion

ASMs. By contrast, American and the other legacy airlines collectively shrunk their capacity in these markets by 7 percent, or approximately 5 billion ASMs.

38.    Just as JetBlue had aggressively introduced capacity, so too has JetBlue challenged the legacy airlines in other ways. As JetBlue explained, "carriers like JetBlue play a vital role in keeping the commercial aviation industry competitive here and abroad." The "presence of smaller competitive carriers like JetBlue helps push fares down across the board."

39.    As JetBlue explained to investors in 2021, "JetBlue is a unique airline with a differentiated strategy supported by a number of competitive advantages." JetBlue has a significantly lower cost structure than the legacy competitors, allowing it to operate profitably while charging lower fares. As a result, JetBlue has had a long and public track record of significantly lowering fares when it enters a market.

**C.    The Alliance Restricts Capacity and Raises Prices**

40.    Before the Alliance, price competition between Defendants was intense, with JetBlue moving aggressively to win market share on routes out of Boston and other major airports in the Northeast.  In November 2018, JetBlue launched a regional fare sale on routes in several of its focus cities, including Boston, which American matched.  According to testimony from American's Regional Sales Director, Paul Swartz, at the DOJ trial (discussed below), JetBlue's $99 fully refundable fare for corporate travelers flying Boston Logan-Ronald Reagan Washington National Airport ("DCA") and increased frequencies on that route created a "problem" for American in 2019, and JetBlue's regional fares triggered a fare war between Defendants, with each matching the other's pricing decreases.

41.    In May 2019, in the face of JetBlue's competitive pressure, American attempted two system-wide price increases on its fares.  However, those attempted price increases failed in markets where JetBlue competed and American was forced to lower its prices.

42.    In December 2019, JetBlue added "shuttle flights" from Boston Logan to LaGuardia, DCA, and Philadelphia International Airport ("PHL") in an effort to compete with American and Delta.  Responding to this increased competition, American approved higher shuttle discounts for corporate customers on Boston Logan-LaGuardia routes in order to "keep [JetBlue] out of the shuttle routes."  American's published fares on these routes decreased.  Under the Alliance, on January 4, 2022, American exited the Boston Logan-LaGuardia route, transferring that route entirely to JetBlue.

43.    JetBlue's competitive measures also helped lower fares on other heavily trafficked routes.  In 2014, JetBlue launched its revolutionary new product, Mint.  Mint, originally offered on flights between New York and Los Angeles and New York and San Francisco, featured lie-flat seats and suites, a small plates menu, free Wi-Fi, extra seat and leg space, and enhanced entertainment options.

44.    When JetBlue entered the JFK to Los Angeles ("LAX") route with Mint service in June 2014, American and Delta lowered their fares to match JetBlue.  As a result, business class fares on the JFK-LAX route decreased.  Refundable walk-up fares decreased 65%, nonrefundable walk-up fares decreased 49%, and non-refundable 30-day advance purchase fares decreased 79% following JetBlue's Mint entry on JFK-LAX.

45.    In 2015 and 2016, JetBlue announced expansions of its Mint service, adding substantially more routes, including routes from Boston to Los Angeles and San Francisco.  Prices on these routes fell following JetBlue's introduction of its Mint service, with American's lowest fares dropping 50%.  At trial, JetBlue's Vice President of Network Planning, Andrea Lusso, testified that Mint was revolutionary in the transcontinental markets, resulting in lower premium fares.

46.    On the JFK to LAX route in particular, American and Delta fares dropped significantly after JetBlue introduced Mint.  Before Mint, the lowest premium fare offered was $3,000; after JetBlue entered the market, American and Delta both offered $599 fares in 2016, and $659 fares in 2018.  In March 2020, American further lowered fares on JFK to LAX, and JetBlue matched those lower fares.  Similar price reductions were seen on the JFK to SFO route, where American and Delta lowered their premium fares from about $2,000 to $506.  The introduction of Mint also resulted in competing airlines also increasing the number of fare options, the number of business class seats, a decrease in ancillary fees, such as change fees, and upgraded aircraft equipment.

47.    All of this changed when, on July 16, 2020, Defendants announced the formation of the Alliance.

48.    As a result of the Alliance, Defendants have stopped competing with one another on routes subject to the Alliance.  Defendants have reduced capacity on overlapping routes, depriving consumers of increased choice and higher quality service and causing consumers to pay higher fares.  Indeed, JetBlue's capacity in the first quarter of 2022 was lower than in 2019, but revenue was at record high levels.  Additionally, the Alliance has allowed Defendants to "recapture" each other's prospective and actual consumers; meaning, because of the size of their collective market share, consumers, if they felt a price at one of the two airlines was too high, would likely end up choosing the other airline.  Taken together, their dominant collective market shares over the routes subject to the Alliance complemented each other's businesses; and, because the two sides share revenue from the Alliance, business lost to the other airline can be recouped through the revenue sharing agreement.

49.    Defendants touted the new partnership and released infographics to show what was foreseen by Defendants in terms of the Alliance's benefit for consumers of the two airlines:



50.    Defendants combined market share ranges from 48.5 percent to 96 percent in the eleven Boston nonstop overlap markets, and from 36 percent to 97 percent in sixteen JFK/LGA nonstop overlap markets, and is 31 percent in one Newark nonstop overlap market.

**D.    The Department of Transportation's Review of the Alliance**

51.    On or about July 22, 2020, Defendants submitted to the DOT "cooperative agreements, including code-sharing and alliance agreements" for review under 49 U.S.C. § 41720, which requires each of the major air carriers who entered into the agreement to submit a copy of the agreement and related materials to the Secretary of Transportation at least 30 days before the agreement takes effect.  Under 49 U.S.C. [§] 41712, "[t]he Department [of Transportation] retains independent statutory authority under 49 U.S.C. § 41712 to prohibit unfair methods of competition

in air transportation to further its statutory objectives to prevent predatory or anticompetitive practices and to avoid unreasonable industry concentration."

52.    On August 20, 2020, the DOT extended the waiting period for the code-sharing agreement to take effect 90 days from August 21, 2020 to November 19, 2020. Ultimately, the DOT did not render a decision based on the legality of the Alliance, allowing the Alliance's code-sharing agreement to take effect.

53.    The reasons for this, according to the DOT, were two-fold: first, because the DOT stated that "the Department intends to defer to DOJ, as the primary enforcer of Federal antitrust laws to resolve the antitrust concerns that the DOJ has identified with respect to [the Alliance]" and, second, because:

> [Section 41720] does not provide the Department authority to approve or disapprove agreements submitted for review under that section; rather, the section gives the Department a limited period of time to review the agreements before such agreements may take effect. DOJ, which is responsible for enforcing Federal antitrust laws and has also been conducting its own review of the [Alliance], had not concluded its investigation at the time DOT's review period ended….
>
> In this context, DOT's review of the [Alliance] under [S]ection 41720 was not designed to approve or disapprove the alliance.

54.    The DOT, during the limited window it had to review the Alliance, was able to reach an agreement for minor concessions by Defendants, but stated that the agreement "did not address all of the Department's concerns resulting from the [Alliance]'s impacts on competition, but instead sought concessions from the carriers that were intended to mitigate some of the anticompetitive harm while providing a means for monitoring the [Alliance's] implementation."

55.    Critically, according to a DOT Notice issued in September 2021, "[t]he parties to the [DOT Agreement] recognized that the [A]lliance was still subject to the antitrust laws, that DOJ was continuing its review, and that DOT retained its authority to remedy any anticompetitive

harm." Historically, under 49 U.S.C. § 41712, the DOT "prohibits anticompetitive conduct that (1) violates the antitrust laws, (2) is not yet serious enough to violate the antitrust laws but may well do so if left unchecked, or (3) although not a violation of the letter of antitrust laws, is close to a violation or is contrary to their spirit." *See, e.g.*, *ASTA v. United Airlines, Inc., et al.*, Docket No. OST-99-6410, Order 2002-9-2 (Dep't of Transp. Sept. 4, 2002) (citing *E.I. DuPont de Nemours & Co. v. FTC*, 729 F.2d 128, 136-37 (2d Cir. 1984)).

### E. Spirit Airlines, Inc. and Others Complain About the Alliance to the Department of Transportation

56. On January 7, 2021, Spirit Airlines, Inc. ("Spirit Airlines") filed a formal complaint with the DOT regarding the Alliance. *Spirit Airlines, Inc.*, Docket No. OST-20210001 (Dep't of Transp. Jan. 7, 2021). Additionally, Spirit Airlines claimed that the information disclosed about the Alliance to the public was insufficient during the DOT's review and that "the remedies agreed to in the DOT Agreement [between the DOT, JetBlue, and American] were insufficient to address anticompetitive concerns." The Spirit Airlines complaint led to other groups filing public comments about the Alliance being anticompetitive, including other airlines, an airline association, a non-profit focused on competition, and a consumer advocacy organization. However, these comments were filed after the public release of the agreement made between the DOT, JetBlue, and American.

57. The DOT stayed the proceedings in *Spirit Airlines, Inc.* while the DOJ's action proceeded.

### F. The Department of Justice and Several States' Attorneys General Sue to Stop the Alliance

58. On September 21, 2021, the DOJ, along with the State of Arizona, the State of California, the District of Columbia, the State of Florida, the Commonwealth of Massachusetts, the Commonwealth of Pennsylvania, and the Commonwealth of Virginia sued Defendants under

§ 1 of the Sherman Act, 15 U.S.C. § 1, stating: "[T]he United States and Plaintiff States bring this action to prevent the harm to consumers that will occur once the [Alliance] is fully implemented . . . ." *United States v. American Airlines Group Inc.*, No. 1:21-cv-11558 (D. Mass., filed Sept. 21, 2021) (the "DOJ Action"), ECF 1 (the "DOJ Complaint").

59.     The DOJ Complaint states:

> By consolidating [defendants'] businesses in this way, American and JetBlue will effectively merge their operations on flights to and from the four airports…. In so doing, the Northeast Alliance will eliminate significant competition between American and JetBlue that has led to lower fares and higher quality service for consumers traveling to and from those airports. It will also tie JetBlue's fate to that of American, diminishing JetBlue's incentives to compete with American in markets across the country. The United States and Plaintiff States bring this action to prevent the hundreds of millions in harm to consumers that will occur if these two rivals are permitted to maintain this [Alliance].

60.     The federal court overseeing the DOJ Action denied Defendants' motion to dismiss the case, stating in relevant part: "[T]he [Alliance] at issue between American and JetBlue is likely to harm competition in the relevant markets, and that American and JetBlue control a significant share in an already concentrated market," and the DOJ Action proceeded to trial. DOJ Action, ECF 103.

61.     In September 2022, the trial began. At trial, the DOJ and the Plaintiff States attested to government economists' estimates that consumers would be harmed to the tune of $700 million annually and that, because of JetBlue's removal as a low-cost carrier, other airlines would be less incentivized to participate in price competition after JetBlue's Alliance with American.

62.     The trial concluded on November 18, 2022, after an 18-day bench trial. DOJ Action, ECF 327. No decision has been rendered yet.

**G.**     **The Alliance Is Anticompetitive and Causes Antitrust Injury**

63.     The Alliance combines Defendants' respective market share at Boston Logan, LaGuardia, JFK, and Newark Liberty.  Prior to the Alliance, JetBlue already had the largest market share at Boston Logan, which only grew with the agreement between Defendants.

64.     Specifically, the DOJ presented evidence at trial that for routes between Boston Logan and 12 major airports, Defendants have a combined revenue share of over 49.8% for each of those routes, as listed below:

        (a)     Boston – Charlotte: 96.1% (combined revenue share);

        (b)     Boston – Chicago: 48.5%;

        (c)     Boston – Dallas: 83.6%;

        (d)     Boston – Los Angeles: 62.6%;

        (e)     Boston – Miami: 76.5%;

        (f)     Boston – New York City (JFK or LaGuardia): 49.8%;

        (g)     Boston – PHL: 86.8%;

        (h)     Boston – Phoenix: 85.2%;

        (i)     Boston – Rochester: 86.2%;

        (j)     Boston – Syracuse: 82.1%; and

        (k)     Boston – Washington D.C. (DCA): 88%.

65.     Each of these revenue shares is considered to be anticompetitive under the conventional Herfindahl-Hirschman Index ("HHI") test, which measures market concentration and potential for anticompetitive conduct.  Market concentration harms consumers because it eliminates consumer choice, throttles price competition, reduces incentives to increase supply and to innovate, and tends to negatively influence downward pricing pressure.

66. Additionally, the DOJ presented evidence at trial that for routes between JFK, LaGuardia or Newark Liberty and 18 major airports, Defendants have a combined revenue share of over 31% for each of those routes, as listed below:

    (a)    New York (JFK/LaGuardia) – Austin: 44.6%;

    (b)    New York – Charleston: 43.6%;

    (c)    New York – Chicago: 36.2%;

    (d)    New York – Las Vegas: 46.5%;

    (e)    New York – Los Angeles: 57%;

    (f)    New York – Martha's Vineyard: 92.5%;

    (g)    New York – Miami: 55.9%;

    (h)    Newark Liberty – Miami: 31%;

    (i)    New York – Nantucket: 96.8%;

    (j)    New York – Orlando: 55.3%;

    (k)    New York – Phoenix: 61.5%;

    (l)    New York – Portland: 37.4%;

    (m)    New York – Raleigh-Durham: 47.8%;

    (n)    New York – San Diego: 44.7%;

    (o)    New York – San Francisco: 45.7%;

    (p)    New York – Savannah: 46.5%; and

    (q)    New York – West Palm Beach: 60%.

67. Each of these revenue shares is considered to be anticompetitive under the conventional HHI test.

68. In 2019, prior to the Alliance, the general, non-route specific market share of each of the two airlines in the New York City and Boston metro areas were as follows:

    (a)    New York City:

      (i)     JetBlue: 24%

      (ii)    American: 16%

  (b)   Boston:

      (i)     JetBlue: 35%

      (ii)    American: 16%

69.    Thus, the combined market share in 2019 of the two previously independent entities is as follows:

  (c)   New York City:  JetBlue and American: 40%

  (d)   Boston:  JetBlue and American: 51%

70.    These dominant market shares allow Defendants to dictate flight availability, fare pricing, and other variables at the four airports.  These dominant market shares also increase prices for flights on other airlines, which respond to higher prices and a decreased ability to usher out flights from the airports at-issue.

71.    The anticompetitive harm from American and JetBlue's collusion is not limited just to routes that they both flew into, out of, or through Boston Logan, JFK, LaGuardia, and Newark Liberty. When the DOJ sued American and JetBlue, it calculated the effect of the Alliance on 98 routes that involved connecting service at one of the four airports. On each of those routes, American and JetBlue's Alliance raised the HHI by more than 200 points, to totals exceeding (and often far exceeding) 2,500 points. Accordingly, American and JetBlue must be presumed to have enhanced their market power and harmed competition on all of those routes, as well.

72.    Competition and consumers alike are harmed as a result of the Alliance, including, but not limited to, the following effects: the Alliance eliminates head-to-head competition between Defendants, reducing consumer choice as well as price competition in the market generally, and increases the likelihood of anticompetitive coordination.

73.     Defendants themselves have recognized this very harm when examining the threat of other airlines entering into similar alliances: American, in its 2021 Annual Report, discusses how "additional mergers and other forms of industry consolidation" could harm American's bottom line and market share:

> Depending on which carriers combine and which assets . . . [American's] competitive position relative to the post-combination carriers or other carriers that acquire such assets could be harmed. In addition, as carriers combine through traditional mergers or antitrust immunity grants, their route networks will grow, and that growth will result in greater overlap with our network, which in turn could decrease [American's] overall market share and revenues.

74.     This was also articulated by Defendants in deposition testimony and at trial in the DOJ and Plaintiff States' case:

    (a)    Paul Swartz, American's Regional Sales Manager, when asked "[s]o you no longer compete with JetBlue," answered "[Y]es";

    (b)    Brian Znotins, American's Vice President, Network & Regional Schedule Planning, when asked "[s]o you are no longer competitors [with JetBlue] on those [Alliance] routes from a network perspective," answered "Yes";

    (c)    Robin Hayes, JetBlue's CEO, when asked "[a]nd you would agree that, within the [Alliance], where the two airlines are coordinating capacity, JetBlue and American no longer compete with each other, correct?" answered "[W]e don't compete with each other directly"; and

    (d)    Scott Laurence, American's SVP of Partnership Strategy, when asked "[w]ith the [Alliance] in place, do you agree that the revenue sharing component means that it makes more sense to cooperate with American than compete?," answered "For [Alliance] routes, yes."

75.     Defendants' direct competitors in the Relevant Market have likewise recognized the harm to consumers and competition. Some of the concerns articulated by competitors include harm to consumers (in the form of higher prices, reduced choice, and, subsequently, being priced out of the Relevant Market), the inability for new entrants in the market (because Defendants

control the available slots at airports which would be needed in order to viably compete with Defendants), and other types of harm.

76.     The Alliance has already caused harm to the competitive process, which, in turn, has resulted in consumers such as Plaintiffs paying higher prices.  For example, as a result of the Alliance, American exited the Boston Logan to LaGuardia route.  On the Boston Logan to DCA route, Defendants fly fewer flights today than before the Alliance.  Further, JetBlue has agreed to take over from American the JFK to San Francisco ("SFO") route, with American planning to exit that route.

77.     This reduction in capacity has predictably resulted in higher prices, poorer-quality service and fewer passengers.  For example, when JetBlue left the JFK to Richmond route, fares rose by 65% and passenger counts fell by 49%.  According to testimony and documents presented at the DOJ trial, when American stopped flying JFK to San Diego ("SAN") due to the 737 MAX grounding, JetBlue "'ignor[ed] AA pricing, until it becomes clear they will re-enter the market,'" and JetBlue "'down-bucketed its entire fare structure in JFK to San Diego,'" which "'effectively increased fares by $20-$40 throughout the structure.'"  As a result, JFK-SAN was "'one of the highest-fare trans-con markets in the system.'"  Additionally, on at least eight routes out of New York City, JetBlue increased its prices, on average, by 7.8%.

78.     This is consistent with the conclusion reached by Spirit Airlines in its complaint with the DOT, which was bolstered by economic analysis of how consumers would be impacted by the Alliance.  Generally, the analysis found that consumers would be harmed:

# The Strategic Partnership Is Likely to Harm Consumers

A 5% fare benefit from the AAdvantage program is likely and would result in $383 million in higher costs for Air Travelers and the increase fares would price 2.7 million O&D passengers out of the air travel market.

| | Passengers Subject to Fare Increase | | Average Fare Increase | | Revenue Impact of Higher Average Fares | Passengers Lost Due to Higher Average Fares |
|---|---|---|---|---|---|---|
| Total | 37,476,531 | $ | 10.24 | $ | 383,767,385 | 2,712,778 |
| BOS | 12,188,847 | $ | 9.54 | $ | 116,272,321 | 882,303 |
| JFK | 24,404,280 | $ | 10.66 | $ | 260,202,725 | 1,766,530 |
| EWR | 478,667 | $ | 8.79 | $ | 4,208,268 | 34,649 |
| LGA | 404,737 | $ | 7.62 | $ | 3,084,071 | 29,297 |

79.    Specifically, Spirit Airlines did an analysis of how the Alliance would impact consumer pricing, and found that even marginal increases in airfares as a result of the Alliance would result in hundreds of millions of dollars of revenue for Defendants on an annual basis:

# Impact of Higher Fares on Consumer Prices
(Increased revenue in millions, annually)

Given JetBlue's recent fare trends it is likely that the Strategic Partnership will increase fares in the range of 5% or more. Each 1% increase will raise the cost to consumers by roughly $80 million annually

| Market | 1% Increase | 3% Increase | 5% Increase |
|---|---|---|---|
| Total | $  81.2 | $  236.9 | $  383.8 |
| BOS | $  24.6 | $  71.8 | $  116.3 |
| JFK | $  55.1 | $  160.6 | $  260.2 |
| EWR | $  0.9 | $  2.6 | $  4.2 |
| LGA | $  0.7 | $  1.9 | $  3.1 |

- Given the scope of the Strategic Partnership and the leverage and market power of the AAdvantage program, an increase of 5% is likely if not conservative

80.     As a result of these increases in price, more consumers would be "priced out of the market" for airfare.  Spirit Airlines also did an analysis of the effect of higher prices on consumer demand:

# Impact of Higher Fares on Consumer Demand
(Lost passengers in thousands, annually)

As price increases, more passengers will be priced out of the market. For each 1% increase in price, slightly more than half a million travelers will be lost; the impact of the Strategic Partnership will negatively impact over 2.5 million.

| Market | 1% Increase | 3% Increase | 5% Increase |
|---|---|---|---|
| Total | 542.6 | 1,627.7 | 2,712.8 |
| BOS | 176.5 | 529.4 | 882.3 |
| JFK | 353.3 | 1,059.9 | 1,766.5 |
| EWR | 6.9 | 20.8 | 34.6 |
| LGA | 5.9 | 17.6 | 29.3 |

- The displaced demand of higher fares would normally present an opportunity for more efficient competitors to enter the market and satisfy that demand, but congestion at these airports limit effective new entry.

81.     These analyses by Spirit Airlines show the impacts of the Alliance on consumers: higher prices leading to a decline in demand due to "more passengers [being] priced out of the market."

82.     Additionally, this has been the conclusion of the States' Attorneys General and the DOJ whose expert estimates that the Alliance would cause up to $700 million in higher fares for consumers annually.

83.     During the Class Period, both Defendants have cut routes and reduced the amount of planes in the air "in an effort to stabilize operations." This is direct evidence that consumers are experiencing reduced output and diminished service quality. Indeed, American's internal assessment of whether the Alliance was resulting in higher quality of service ("QSI") at the four airports shows that, first, other airlines' QSI improved more than either American or JetBlue during the Alliance implementation, and second, that JetBlue actually lost QSI share.

84.     These are the types of harms that the antitrust laws were intended to combat and prevent. Additionally, there are threats to consumers beyond just price and output.

**H.    Defendants Profit from the Alliance**

85.     Ultimately, the Alliance was formed because, as other airline mergers and quasi-mergers have shown, controlling a dominant market share over (and stamping out competition) some of the most travelled routes in the Relevant Market is highly profitable. Defendants have profited substantially as a result of the Alliance. For example, in JetBlue's 2021 Annual Report, JetBlue states that it reached $100 million in gross code-share revenue generated by the Alliance. In that same Annual Report, JetBlue states it

> …continue[s] to seek additional strategic opportunities through new commercial partners as well as assess ways to deepen existing airline partnerships, including the [Alliance]. [JetBlue] plan[s] to do this by expanding codeshare relationships and other areas of cooperation such as frequent flier programs. [JetBlue] believe[s] these commercial partnerships

allow [it] to better leverage [its] strong network and drive incremental traffic and revenue.

86.    Defendants have continued to expand the reach of the Alliance, despite the anticompetitive nature of the Alliance.  American will be "launching" six new Alliance routes out of LaGuardia, JetBlue will offer four new routes from LaGuardia, and JetBlue will offer a new route from Boston Logan and from JFK.

## MARKET POWER AND MARKET DEFINITION

87.    To the extent Plaintiffs may be required to plead the relevant product and geographic markets, as opposed to relying on direct evidence of market power, they allege as follows.

88.    The relevant product market is the market for scheduled commercial air passenger service in the United States.

89.    American and JetBlue acquired and used market power, jointly obtained and used monopoly power, and/or attempted jointly or individually to acquire and use, monopoly power in the relevant market by constraining capacity and raising prices for flights to, from, or through Boston Logan, JFK, LaGuardia, and Newark Liberty.

90.    Millions of passengers yearly fly across the country from the Alliance's airports; millions converge on those airports; and even more pass through them on the way to their final destination. By restricting capacity (i.e., diminishing output) and raising prices on flights to, from, or through Boston Logan, JFK, LaGuardia, and Newark Liberty, the anticompetitive effects of the Alliance was felt around the country.

91.    Accordingly, the relevant geographic market, to the extent one must be alleged, is the United States.

92.     Each of these airports is resource-constrained—whether by gate availability, slot availability, or restrictions on air traffic. Each airport can accommodate only so much traffic, and, therefore, can support only so much capacity.

93.     An airline, or an alliance of airlines, can acquire and hold market power at Boston Logan, JFK, LaGuardia, or Newark Liberty by controlling a significant number of gates, or holding a significant number of take-off or landing slots.

94.     As one airline or alliance of airlines acquires more of one of these finite, limited resources, its gain must come at a competitor's loss, because new slots, gates, and physical space for air traffic cannot be created. Accordingly, even modest gains in one or more of these resources can represent a significant gain in market power, as the acquiring airline's or alliance of airlines' power grows, its competitors' diminishes.

95.     Because of the resource constraints at Boston Logan, JFK, LaGuardia, and Newark Liberty, there are high barriers to entry for would-be new competitors, shoring up the market power of existing market participants.

96.     An airline or alliance of airlines with market power at Boston Logan, JFK, LaGuardia, and/or Newark Liberty has the power to restrict the availability of flights within the relevant market in at least three ways.

97.     First, an airline or alliance of airlines with market power in the relevant market may choose to fly fewer flights, leaving its designated resources such as gates and slots unused. This would reduce the number of planes available to passengers.

98.     Second, an airline or an alliance of airlines could fly smaller planes. Smaller planes have fewer seats, which means fewer passengers on each flight.

99.     Third, an alliance of airlines could coordinate their schedules—removing competing flights along the same route at roughly the same time on two or more airlines.

25

100.    An airline or an alliance of airlines that engages in one or more of these strategies restricts the capacity at the affected airport. That is, it reduces the number of seats available to passengers, driving down supply.

101.    An airline or alliance of airlines with market power at Boston Logan, JFK, LaGuardia, and/or Newark Liberty could raise prices above competitive levels. Specifically, it can profitably affect a small but significant, non-transitory increase in the price for airfare within the relevant market without suffering a loss of airfare sales.

102.    Given the efficiency and time savings of air travel, not enough passengers would switch their travel plans from air travel to train, bus, or car in response to a small but significant, non-transitory increase in the price of airfare. Therefore, a hypothetical monopolist in the market for scheduled commercial air passenger service to, from, or through Boston Logan, JFK, LaGuardia, and/or Newark Liberty could profitably raise prices without losing business.

103.    Since air travel involves a set departure location and a set arrival location, passengers tend to pick departure airports near where they are located, and arrival airports near to their destination. Passengers would not want to travel to airports farther from their locations to catch departing flights, nor arrive at airports remote from their intended destinations.

**ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE**

104.    During the Class Period, as defined below, Plaintiffs and members of the Class purchased airfare directly from American and/or JetBlue. As a result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class were compelled to pay, and did pay, artificially inflated prices for airfare to, from, or through Boston Logan, JFK, LaGuardia, and/or Newark Liberty.

105.     Those prices were substantially higher than the prices that Plaintiffs and members of the Class would have paid absent the unlawful conduct alleged herein because (1) the price of scheduled commercial airfare was artificially inflated by Defendants' illegal conduct; and (2) the purchasers were deprived of the opportunity to purchase equivalent, but lower-cost air travel, since Defendants' abuse of their market power caused prices to rise for all air travel to, from, or through the affected airports.

106.     As a result, Plaintiffs and members of the Class have suffered damages in the form of overcharges. The exact quantum, form, and components of the damages suffered will be calculated after discovery and upon proof at trial.

107.     Defendants' efforts to monopolize the market for scheduled commercial air passenger service to, from, or through Boston Logan, JFK, LaGuardia, and Newark Liberty have substantially affected interstate and foreign commerce.

108.     At all relevant times, Defendants sold and provided scheduled commercial air passenger service in a continuous and uninterrupted flow of commerce across state lines and national lines and throughout the United States, including within this District.

109.     At all relevant times, Defendants transmitted funds as well as tickets, passenger information, invoices, payments, and other forms of business communications in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of scheduled commercial air passenger service to, from, or through Boston Logan, JFK, LaGuardia, and/or Newark Liberty.

110.     In furtherance of their efforts to monopolize and restrain competition in the relevant market, Defendants employed the U.S. mail and interstate and international wire lines, as well as

means of interstate and international travel. Defendants' activities were within the flow of and have substantially affected interstate commerce.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this Action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) as representatives of the Class, which is defined as follows:

> All persons or entities in the United States or its territories who purchased airline tickets for travel departing from, connecting through, or arriving at Boston Logan International Airport, John F. Kennedy International Airport, LaGuardia Airport, and/or Newark Liberty International Airport, directly from American Airlines Group, Inc. and/or JetBlue Airways Corp., and any of their parents, affiliates, subsidiaries, predecessors, or successors during the time period beginning when the Alliance took effect in or about January 1, 2021 until the anticompetitive effects of the defendants' conduct ceases (the "Class Period").

Excluded from the Class are the Defendants, any entity in which the Defendants have controlling interest, and the Defendants' current or former officers, directors, employees, and their immediate family members. Also excluded are Defendants' legal representatives, successors, subsidiaries, and assigns.

112.    The Class is so numerous that joinder of all members in this Action is impracticable. There are millions of members in the proposed Class who, like Plaintiffs, bought tickets from American and/or JetBlue directly during the proposed Class Period for flights which either originated from or landed at Boston Logan, JFK, LaGuardia, or Newark Liberty airports.

113.    Plaintiffs' claims are typical of those of the Class.  Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for flights than they otherwise would have in a normal, competitive market.

114.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex and antitrust and unfair competition class actions. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interest of Plaintiffs are not antagonistic to the interests of the Class.

115.    Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual Class members because Defendants have acted and refused to act on grounds generally applicable to the Class.

116.    Common questions of law and fact for the Class include, but are not limited to:

(a)    whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of flights originating or landing in the aforementioned airports;

(b)    if Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates §1 of the Sherman Act, 15 U.S.C. §1, under the *per se*, quick look, or rule of reason modes of analysis;

(c)    if Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated prices and/or artificially suppressed supply in the relevant market;

(d)    whether Defendants, collectively, had market power in the relevant market;

(e)    whether, in negotiating, drafting, executing, and performing under the agreements that formed the Alliance, Defendants (whether individually or jointly) specifically intended to monopolize the relevant market;

(f)    whether, even if Defendants did not successfully together monopolize the market, they had a dangerous probability of succeeding at monopolizing the market (either individually or jointly);

29

(g)     whether and to what extent Defendants' conduct as alleged herein caused the Class to sustain overcharge damages; and

(h)     the proper measure of damages suffered by the Class.

117.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this Action.

## CAUSES OF ACTION

### COUNT I
### Agreement in Restraint of Trade
### For Violation of § 1 the Sherman Act (15 U.S.C. § 1)
### (Against All Defendants)

118.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

119.    Defendants entered into the Alliance which consists of a set of agreements. Among those agreements are agreements to coordinate, rather than compete, when scheduling air passenger service, deciding which routes each company would fly, and setting the capacity of those flights; to pool the excess revenue earned as a result of the Alliance, then share in those monopoly profits; to withhold the limited resources of slots and gates from competitors; and to "codeshare" in marketing their flights, making the two companies' products effectively one product.

120.    The Alliance qualifies as a contract, combination, and conspiracy within the meaning of § 1 of the Sherman Act, 15 U.S.C. § 1.

121.    Under the Alliance, American and JetBlue cooperate rather than compete. Because American and JetBlue no longer view themselves as competitors within the geographic scope of the Alliance, they have eliminated the head-to-head competition along routes to, from, and through the airports included in the Alliance that had previously increased capacity and decreased airfare.

122.    By entering into the Alliance, Defendants have unreasonably restrained competition in the relevant market by allocating the market, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

123.    By removing a competitor from the market as a result of the Alliance, Defendants decreased the amount of available air passenger service—i.e., they restricted output by allocating the market amongst themselves.

124.    By restricting the output of the market, thus decreasing supply, Defendants were able to raise prices on scheduled commercial air passenger service to, from, and through Boston Logan, JFK, LaGuardia, and Newark Liberty.

125.    The restriction of output and increase in prices caused by Defendants' conduct affected not only passengers on American and JetBlue's planes, but all scheduled commercial air travelers' available choices and fares.

126.    By entering into the Alliance, Defendants have caused Plaintiffs and members of the Class to pay supra-competitive prices for airline tickets to from, and through Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the relevant market.

127.    There are no procompetitive justifications for the Alliance, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

128.    Defendants' conduct is unlawful under a *per se* mode of analysis.

31

129.    In the alternative, Defendants' conduct is unlawful under either a quick look or rule of reason mode of analysis.

## COUNT II
**Conspiracy to Monopolize**
**For Violation of § 2 of the Sherman Act (15 U.S.C. § 2)**
**(Against All Defendants)**

130.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

131.    Defendants entered into several agreements in furtherance of the Alliance.

132.    The Alliance qualifies as a contract, combination, and conspiracy within the meaning of § 1 of the Sherman Act, 15 U.S.C. § 1.

133.    Through the Alliance, Defendants conspired to obtain, maintain, and use monopoly power in the market for scheduled air passenger service.

134.    The goals and purposes of the Alliance was (1) to consolidate Defendants' market shares in order to control a commanding proportion of the market; (2) obtain and utilize the ability to restrict capacity by allocating various travel routes among themselves; (3) raise prices for scheduled air passenger service along those routes; and (4) split the monopoly profits between them.

135.    Defendants designed the Alliance to align their incentives towards inflated joint profits; constructed the Alliance Agreement to require coordinating routes, flight times, and plane sizes to maximize their profits at the expense of purchasers including Plaintiffs and the Class; and included provisions that prevented either company from ceding the limited resources for growth to competing companies. This is evidence of their specific intent to accomplish anticompetitive ends.

136.    Defendants obtained monopoly power in the relevant market.

32

137.    Defendants had the power to affect a small but significant, non-transitory increase in price in the relevant market. And they had the power to restrict output (i.e., capacity).

138.    Defendants did not acquire this power by offering a superior product, nor as a result of business acumen, nor historic accident. Rather they acquired this power by agreeing to allocate their substantial collective market share amongst themselves, in order to reduce capacity on flights to, from, and through Boston Logan, JFK, LaGuardia, and Newark Liberty airports.

139.    Defendants acquired monopoly power through their conspiracy effectuated by the Alliance. The conspiracy continues to this day. Defendants continue to perform under the agreements that form the Alliance. Upon information and belief, Defendants have collectively agreed to conceal the anticompetitive effects of the Alliance by not raising prices as much as they otherwise could or would while judicial review of their conduct is ongoing.

140.    By entering into the Alliance, Defendants have decreased capacity (output) and raised airfare (prices) along routes flown to, from, and through Boston Logan, JFK, LaGuardia, and Newark Liberty airports.

141.    Under the Alliance, Defendants have agreed to pool and share their excess revenue earned through the Alliance.

142.    The Alliance created substantial additional revenue for Defendants. That excess revenue represents excess fares charged to purchasers, including Plaintiffs and the Class.

143.    By entering into the Alliance, Defendants have caused Plaintiffs and members of the Class to pay supra-competitive prices for airline tickets to, from, and through Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the relevant market.

**COUNT III**
**Attempted Monopolization**
**For Violation of § 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**
**(Against American Airlines Group, Inc.)**

144.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

145.    In the alternative, Defendant American has engaged in anticompetitive, exclusionary conduct by entering into the Alliance.

146.    American entered into the Alliance with the specific intent to achieve monopoly power in the relevant market, as described above.

147.    Due to its significant market share, American's conduct as set forth in this Complaint represents a dangerous probability of American successfully obtaining a monopoly position in the relevant market.

148.    American's anticompetitive, exclusionary conduct of entering into the Alliance constitutes attempted monopolization in violation of § 2 of the Sherman Act.

149.    By entering into, and performing under, the Alliance, American was able to reduce capacity (restrict output) and raise prices for scheduled commercial air passenger service in the relevant market.

150.    American's actions leading to restricted output and raised prices caused purchasers, like Plaintiffs and members of the Class to pay supra-competitive prices for airline tickets to, from, and through Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the relevant market.

151.    Plaintiffs and members of the Class have been injured by American's attempt to monopolize the relevant market as alleged in this Complaint, in part, by paying supra-competitive prices for airline tickets to, from, or through Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the relevant market.

<u>**COUNT IV**</u>
**Attempted Monopolization**
**For Violation of § 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**
**(Against JetBlue)**

152.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153.    JetBlue has engaged in anticompetitive, exclusionary conduct by entering into the Alliance.

154.    JetBlue entered into the Alliance with the specific intent to achieve monopoly power in the relevant market.

155.    Due to its significant market share, JetBlue's conduct as set forth in this Complaint constitutes a dangerous probability of JetBlue successfully obtaining a monopoly position in the relevant market through the anticompetitive, exclusionary conduct of entering into the Alliance.

156.    JetBlue's anticompetitive, exclusionary conduct of entering into the Alliance constitutes attempted monopolization in violation of § 2 of the Sherman Antitrust Act.

157.    Plaintiffs and members of the Class have been injured by JetBlue's attempt to monopolize the relevant market as alleged in this Complaint, in part, by paying supra-competitive prices for airline tickets to, from, or through Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the relevant market.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

(a)  Entry of an order certifying this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3), defining the Class as requested herein;

(b)  Entry of an order appointing Plaintiffs as representatives of the Class;

(c) Entry of an order appointing Plaintiffs' counsel as lead counsel for the Class;

(d) Entry of judgment against Defendants holding the unlawful contract, combination, or conspiracy alleged herein is in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

(e) Award to Plaintiffs and members of the Class of damages, to the maximum extent allowed under the applicable laws, including entry of joint and several judgments in favor of Plaintiffs and members of the Class against Defendants in an amount to be trebled to the extent such laws permit;

(f) Entry of an order permanently enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act, on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(g) Award to Plaintiffs and members of the Class of pre- and post-judgment interest as provided by law, to be awarded at the highest legal rate from and after the date of service of this Complaint;

(h) Award of Plaintiffs' reasonable litigation expenses and attorneys' fees to the extent allowed by law; and

(i) Grant of such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  February 15, 2023

*/s/ Robin F. Zwerling*
Robin F. Zwerling
Susan Salvetti
Justin M. Tarshis
**ZWERLING, SCHACHTER
& ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Email: rzwerling@zsz.com
        ssalvetti@zsz.com
        jtarshis@zsz.com

*Counsel for Plaintiffs and the Proposed Class*